**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YVETTE McQUEEN and DEBORAH A. GLOVER, on behalf of themselves and those similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>CREDIT ONE BANK, N.A., et al.,<br><br>*Defendants*. | No. 23-cv-01601 (MEF)(SDA)<br><br>**OPINION and ORDER** |

**Table of Contents**

I.   **Background**
    **A.**   **The Allegations**
    **B.**   **The Lawsuit**
    **C.**   **The Motion**
II.  **Standing**
    **A.**   **Legal Principles**
    **B.**   **Analysis**
III. **The Merits**
    **A.**   **"Firm Offers"**
    **B.**   **Analysis**
IV.  **Conclusion**

\* \* \*

A bank obtained two people's credit reports and offered them pre-approved credit cards.

The people sued, claiming violations of federal law.

The bank now moves for judgment on the pleadings.

The motion is denied.

\*   \*   \*

## I.  Background

### A.  The Allegations

The allegations[1] as relevant for now are as follows.

The bank[2] accessed the credit reports of two people.[3]  See First Amended Complaint ("Complaint") ¶¶ 16, 33.

The bank got the reports from a credit-reporting agency.[4]  See id. ¶¶ 17-20, 34-35.

At around the same time, the bank sent the people "pre-approved" offers for credit cards.  See Amended Answer to Complaint, Exhibits 2-43.

### B.  The Lawsuit

In light of the above, the recipients of the credit card offers ("the Plaintiffs") sued the bank ("the Defendant") on behalf of a putative class.[5]  See Complaint ¶ 1.

Their Complaint presses two claims, each under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.  See id. ¶¶ 55-77.

The gist of each claim: the Defendant got the Plaintiffs' credit reports without a lawful purpose.  See id. ¶ 1.

---

[1]  Because this is a motion for judgment on the pleadings, the Court must treat all allegations as true.  See Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 595-96 (E.D. Pa. 2010) (collecting cases).  Whether they are in fact true --- that is a question for later in the case.

[2]  Credit One Bank, N.A.

[3]  Yvette McQueen and Deborah A. Glover.

[4]  Experian.

[5]  The Plaintiffs also sued John Does 1 to 10.  These people have not been identified or served, and they are not at issue in this Opinion and Order.

### C. The Motion

The Defendant has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

The motion is before the Court.

## II. Standing

Before getting to the merits of the motion, take the Defendant's argument that the Plaintiffs do not have standing. See Reply Brief at 9-10.

The Court's conclusion: this argument is not persuasive.

To see why, start by working through the relevant legal principles, see Part II.A, and then come back to this case. See Part II.B.

### A. Legal Principles

Federal courts exercise the "judicial Power of the United States." U.S. Const., art. III, § 1. That power "extends only to 'Cases' and 'Controversies.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (quoting id.). In turn, "a case or controversy can exist only if a plaintiff has standing to sue." United States v. Texas, 599 U.S. 670, 675 (2023).

There are a few elements of standing. See Spokeo, 578 U.S. at 338.

Only one is arguably at issue here --- the requirement that the plaintiff suffered an alleged "concrete injury." Id. at 341.

A "concrete" injury is "real, and not abstract." TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021) (cleaned up).

And there various kinds of potentially "concrete" injuries --- physical or monetary ones, for example, and also intangible ones. See id. at 425; Spokeo, 578 U.S. at 340.

The alleged injury suffered by the Plaintiffs here is intangible.

\*   \*   \*

To determine whether an alleged intangible injury is concrete, a court assesses whether the injury has "a close relationship to" something --- of which more in a moment --- that has

3

"traditionally [been] recognized as providing a basis for lawsuits in American courts." TransUnion, 594 U.S. at 425; accord, e.g., Spokeo, 578 U.S. at 340–41.

If an alleged injury has that "close relationship," it can likely confer Article III standing. TransUnion, 594 U.S. at 425–26; see Church v. Collection Bureau of Hudson Valley, Inc., 704 F. Supp. 3d 521, 527 (D.N.J. 2023).

But if it does not, the standing inquiry is not yet over.

This is because Congress can "elevate" what had been "previously inadequate in law." TransUnion, 594 U.S. at 425 (cleaned up). That is, Congress can stretch things out by creating a new injury --- and the newly created injury can support Article III standing, so long as it is tethered in an appropriate way to an anchor, to that which has "traditionally [been] recognized." Id. at 425; see Spokeo, 578 U.S. at 341.

\* \* \*

Come back now to the point that was left for later.

Namely, what is a plaintiff's alleged injury compared to? An injury must have a "relationship." TransUnion, 594 U.S. at 425. But to what?

Generally, the cases do not speak explicitly speak to this.

But as they have worked through standing cases in the post-TransUnion era, it appears that federal courts have generally taken two basic sorts of approaches to the questions set out above.[6]

Under the first approach, the plaintiff's alleged injury is compared to a "traditional" cause of action. See, e.g., Merck v. Walmart, Inc., 114 F.4th 762, 780 (6th Cir. 2024) (stating that standing law requires "courts to look out for 'essential' elements of liability that may appear in a traditional cause of action but that the modern claim lacks"); see also, e.g., Gallagher v. Santander Consumer USA, Inc., 125 F.4th 865, 869 (8th Cir. 2025); Hunstein v. Preferred Collection & Mgmt. Servs., Inc., 48 F.4th 1236, 1244 (11th Cir. 2022) (en banc); Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 926 (11th

---

[6] To be sure, the line between these two rough approaches is not always sharply drawn.

4

Cir. 2020); cf. Farrell v. Blinken, 4 F.4th 124, 141 (D.C. Cir. 2021) (Katsas, J., dissenting).

On this approach, a court looks to the "relationship," TransUnion, 594 U.S. at 425, between (a) the newly created statutory injury (in this case, the FCRA injury, of improperly accessing certain personal records) and (b) an analogous and old common-law cause of action (like the tort of intrusion upon seclusion).

Other cases suggest another way forward.

Under this second approach, the plaintiff's alleged injury is compared to a "traditional" harm. See, e.g., Calogero v. Shows, Cali & Walsh, L.L.P., 95 F.4th 951, 958 (5th Cir. 2024); Muccio v. Glob. Motivation, Inc., 2023 WL 5499968, at *1 (11th Cir. Aug. 25, 2023); Drazen v. Pinto, 74 F.4th 1336, 1339 (11th Cir. 2023); Dickson v. Direct Energy, LP, 69 F.4th 338, 346 (6th Cir. 2023); Charlton-Perkins v. Univ. of Cincinnati, 35 F.4th 1053, 1060 & n.5 (6th Cir. 2022); Seale v. Peacock, 32 F.4th 1011, 1020 (10th Cir. 2022); Persinger v. Sw. Credit Sys., L.P., 20 F.4th 1184, 1191 (7th Cir. 2021); Gerber v. Herskovitz, 14 F.4th 500, 506 (6th Cir. 2021); Ward v. Nat'l Patient Acct. Servs. Sols., Inc., 9 F.4th 357, 362 (6th Cir. 2021); Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 653–54 (4th Cir. 2019); Robins v. Spokeo, Inc., 867 F.3d 1108, 1115 (9th Cir. 2017); cf. Hunstein, 48 F.4th at 1267–68 (Newsom, J., dissenting).

On this approach, a court zeroes in on the "relationship," TransUnion, 594 U.S. at 425, between (a) the newly created statutory injury and (b) an analogous and old harm that the law has aimed to protect against (like reputational harm or the harm associated with invasion of privacy).[7]

---

[7] The Supreme Court's leading case has some language that might be taken to support both the first approach and the second one. Compare TransUnion, 594 U.S. at 425 (suggesting what is traditional is intrusion upon seclusion, an old common-law cause of action) with id. (suggesting what is traditional is "reputational harm[]"). And the language of other cases also suggests blending. Compare, e.g., Laufer v. Arpan LLC, 29 F.4th 1268, 1272 (11th Cir. 2022) (plaintiff's "alleged injury . . . bears no 'close relationship' to any traditional common-law cause of action") with id. at 1274 ("emotional injury . . . is a concrete harm") vacated, 77 F.4th 1366 (11th Cir. 2023).

5

In short: there are two basic types of approaches --- one focused on traditional causes of action, the other on traditional harms.[8]

There was a time before the Supreme Court's TransUnion decision when the Third Circuit seemed to lean toward the first approach. See Thorne v. Pep Boys Manny Moe & Jack Inc., 980 F.3d 879, 890–

---

[8] There are potentially meaningful differences between these. For example, under the first approach the initial question for a court is mechanical: what are the elements of the traditional cause of action for, say, intrusion upon seclusion? From there, the question shifts to asking whether Congress, in creating a new injury, abstracted too far away from the traditional tort. (This is somewhat akin to asking whether Congress veered too far from the underlying Fourteenth Amendment right in using its powers under Section 5 of that Amendment. See City of Boerne v. Flores, 521 U.S. 507, 519–20 (1997).) Under the second approach, it would seem that the court is expected to start off in a more open-textured way, by abstracting away from traditional causes of action and asking what "harm" they together meant to be tackling. For example, a family of related torts --- intrusion upon seclusion, appropriation of name or likeness, publicity given to private life, and false light --- might be understood to aim at a broader legal interest, in preventing harms associated with invasion of privacy. See Restatement (Second) of Torts § 652A (1977) (suggesting this). (In some sense, going down this road may be a bit like asking whether individual constitutional rights aggregate up to a broader right, an approach sometimes associated with Griswold v. Connecticut, 381 U.S. 479 (1965).) From there, the question becomes whether in creating a new injury Congress abstracted too far away from the underlying harm. In a nutshell: on the first approach, the anchor is a traditional cause of action, and the question is whether Congress abstracted too far away from it; on the second approach, the court starts off by itself abstracting away from traditional causes of action to articulate a traditional and anchoring harm --- and then asks whether Congress abstracted too far away from that harm. These two approaches may sometimes generate different results. In some cases, for example, the second approach may give Congress more room to create new Article III injuries --- because the baseline set by a traditional harm like invasion of privacy may be broader than the baseline that would be set by any one of its various constituent-part torts.

91 (3d Cir. 2020); Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 114 (3d Cir. 2019).

But the Third Circuit has now held that the second approach, focused on harm, is the one to follow: "we focus our inquiry solely on the harm." Barclift v. Keystone Credit Servs., LLC, 93 F.4th 136, 146 n.4 (3d Cir. 2024). And per the Third Circuit, that "approach is not an exercise in element-matching." Id. Rather, courts within the Third Circuit are to look to a traditional category of harm (in Barclift: the "privacy harm traditionally associated with public disclosure," id. at 146) and ask about the extent to which a plaintiff's injury relates to it.

**B.  Analysis**

Against the backdrop of the governing legal principles, see Part II.A, come back now to this case.

Does the Plaintiffs' injury closely relate to a traditional harm?

The Court's conclusion: yes.

The Plaintiffs allege that the Defendant improperly accessed their private financial information. See Complaint ¶¶ 54, 65, 76.[9]

As alleged, this is plainly an invasion of privacy.

And an invasion of privacy is a traditional harm. See DiNaples v. MRS BPO, LLC, 934 F.3d 275, 280 (3d Cir. 2019) (invasion of

---

[9] In thinking through standing, a court does not assess whether a plaintiff's claim works on the merits. Rather, the court takes the claim as valid and asks whether the injury it allegedly causes can be counted as "concrete" for Article III purposes. See Warth v. Seldin, 422 U.S. 490, 500 (1975); Falcone v. Dickstein, 92 F.4th 193, 202-03 (3d Cir.), cert. denied sub nom. Murray-Nolan v. Rubin, 144 S. Ct. 2560 (2024); Dunne v. Elton Corp., 2024 WL 4224619, at *5 n.15 (3d Cir. Sept. 18, 2024); Cottrell v. Alcon Lab'ys, 874 F.3d 154, 162 (3d Cir. 2017); Parker v. Dist. of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd sub nom. Dist. of Columbia v. Heller, 554 U.S. 570 (2008); Joyce v. Jaguar Land Rover N. Am., LLC, 2025 WL 675888, at *3, *5 n.12 (D.N.J. Mar. 3, 2025).

privacy is a "harm that has traditionally been regarded as providing a basis for a lawsuit in English and American courts") (quoting St. Pierre v. Retrieval-Masters Creditors Bureau, Inc., 898 F.3d 351, 357-58 (3d Cir. 2018)); In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 274 (3d Cir. 2016) (similar); cf. U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press, 489 U.S. 749, 763 (1989) (noting that the common law protected an individual's control of his or her personal information).

\* \* \*

And note: not only does the Plaintiffs' alleged injury amount to a traditional harm, as noted just above --- it is also closely analogous to an old cause of action, the tort of intrusion upon seclusion.[10]

That tort is traditional.  See TransUnion, 594 U.S. at 425; see also Church, 704 F. Supp. 3d at 527 (intrusion upon seclusion "has long been burrowed deep in American law").

And it is clearly implicated here.

To see why, note that at common law a suit for intrusion upon seclusion could be brought against one "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B.

The tort covers direct intrusions on seclusion; for example, when someone opens a neighbor's mail.  See id. at cmt. b (citing Vernars v. Young, 539 F.2d 966 (3d Cir. 1976) (Pennsylvania law)).

And it also covers indirect intrusions, in which the alleged intrusion runs through a third-party intermediary --- as when A intrudes on B's "seclusion" by improperly obtaining B's private information from C ("the bank"):

> A is seeking evidence for use in a civil action he is bringing against B.  He goes to

---

[10] This means that the Plaintiffs' injury is traditional under the harm approach that has been adopted by the Third Circuit, see Barclift, 93 F.4th at 146 --- and would also clear the bar under the other approach, the cause of action approach.  See Part II.A.

8

> the bank in which B has his personal
> account, exhibits a forged court order, and
> demands to be allowed to examine the bank's
> records of the account. The bank submits to
> the order and permits him to do so. A has
> invaded B's privacy.

Id. at illus. 4.

That is this case. The Defendant allegedly intruded on the Plaintiffs' seclusion by improperly obtaining their financial records from a third-party entity that held them, the credit-reporting agency. See Complaint ¶¶ 16, 33, 61-62, 70-71.

\* \* \*

Bottom line: the alleged FCRA injury here is anchored to a traditional harm, invasion of privacy --- and also to a traditional cause of action, intrusion upon seclusion.

And that FCRA injury is tightly enough linked to the relevant traditional harm (and, for that matter, to the relevant traditional cause of action) to confer Article III standing. See Persinger, 20 F.4th at 1189-93 (holding that there was an Article III injury in a § 1681b(f) lawsuit based on the same alleged injury at issue here, accessing credit information via a credit-reporting agency); Nayab v. Cap. One Bank (USA), N.A., 942 F.3d 480, 489-93 (9th Cir. 2019) (same).[11]

---

[11] Note that this is not a case in which an entity allegedly broke a legal obligation about how to handle information --- but nothing came of the mishandling. In that situation, a plaintiff almost surely has no standing. See TransUnion, 594 U.S. at 440; Spokeo, 578 U.S. at 342. Here, there was an alleged failure to properly request private information. See Complaint ¶¶ 16, 33, 61-62, 70-71. But because of that, something allegedly happened to the Plaintiffs --- there was an injurious consequence for them, their information was handed over to a third party, the Defendant. That downstream consequence is critical for Article III purposes. See TransUnion, 594 U.S. at 440; Nayab, 942 F.3d at 490. It marks the border between unlawfulness that for a particular plaintiff is just "in the air," Palsgraf v. Long Island R. Co., 248 N.Y. 339, 341 (1928), in that it does not injure him --- and unlawfulness that does. In the former situation: no standing. See TransUnion, 594 U.S. at 440; see

9

### III. The Merits

Move now to an assessment of the merits of the Defendant's Rule 12(c) motion.

To do so, start with the relevant legal background, see Part III.A, and then look to this case. See Part III.B.

#### A.   "Firm Offers"

Per the FCRA, a creditor (like the Defendant-bank here) can access a person's credit report. See 15 U.S.C. § 1681b(c)(1)(B)(i).

But to access the report, the creditor must be gearing up to make that person a "firm offer of credit." Id.; see generally Anigbogu v. Midland Credit Mgmt., Inc., 2025 WL 247592, at *2 (D.N.J. Jan. 16, 2025).

What is a "firm offer"?

It is an offer that is locked in, pending a last bit of verification. In particular, by making a firm offer the creditor becomes obligated to actually extend the offered-up credit --- contingent only on the creditor verifying that the recipient of the offer meets the screening criteria the creditor used to make the offer in the first place. See 15 U.S.C. § 1681a(l).

So for example, a bank can ask a credit-reporting agency for the reports of all consumers who live in New Jersey --- but only if it will actually extend each of them credit, with the only contingency being that "the verification checks out," Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 195 (3d Cir. 2009), that the front-end criteria (we want New Jersey residents) matches the back-end reality (are the people we sent offers to actually New Jersey residents?).

---

generally Joyce, 2025 WL 675888, at *3 n.11 (explaining part of why). In the latter situation: standing, see TransUnion, 594 U.S. at 439, if the injury is of the right sort (traditional, etc.). See id. at 423-30.

**B.   Analysis**

In this case, the Defendant moves for judgment on the pleadings on the argument that it made the Plaintiffs firm credit card offers --- and for the purpose of making them, was allowed to access their credit reports.  See Renewed Motion at 11-12.

In response, the Plaintiffs put forward various reasons why the offers were not firm, including that the Defendant conditioned the offers on criteria that are disallowed by the FCRA.  See Opposition Brief at 12-16.

The Defendant's reply amounts to this: the conditions were allowed, in part, because they were used to verify that the people who got offers (like the Plaintiffs) met the criteria used in the first place to decide who to reach out to.  See Reply Brief at 9-11.

But this last argument cannot work, at least for now.

The reason: the premise of the argument is that there was a match between the Defendant's front-end selection criteria and its back-end verification conditions --- but the materials before the Court say nothing about the Defendant's up-front selection criteria.

This hole in the record makes judgment on the pleadings impossible, regardless of whether the Defendant's argument might or might not otherwise be persuasive.

\*   \*   \*

How to proceed in light of the above?

One way is to consider allowing the Defendant to amend its answer, so that information as to its criteria is in the pleadings --- and can therefore be relied on in a subsequent Rule 12(c) motion.  This may make sense, given that the Plaintiffs made their improper-conditions argument after the answer was filed.  Compare Opposition Brief (June 3, 2024) at 12-16 (making this argument) with Amended Answer (Jan. 26, 2024).

Another possibility is to allow for tightly targeted discovery and then a focused summary-judgment motion or motions.  That is

11

another way to quickly put information before the Court as to the front-end criteria used by the Defendant.

Questions as to next steps will be taken up by the United States Magistrate Judge, pursuant to an order that will issue today.

## IV. Conclusion

The Defendant's motion for judgment on the pleadings is denied.

IT IS on this 7th day of March, 2025, **SO ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.